United States District Court
Southern District of Texas
**ENTERED**
April 27, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHNNY BABER,        §
(TDCJ #2335688),        §
       §
    *Plaintiff,*        §
       §
vs.        §     CIVIL ACTION NO. H-21-900
       §
HARRIS COUNTY PRECINCT 4        §
SHERIFF, *et al.,*        §
       §
    *Defendants.*        §

## MEMORANDUM OPINION AND ORDER

While he was a state inmate, Johnny Baber, proceeding *pro se* and *in forma pauperis*, filed a Prisoner's Civil Rights Complaint under 42 U.S.C. § 1983 alleging that multiple officers from the Harris County Sheriff's Office, Harris County Precinct 1 Constable's Office, and Harris County Precinct 4 Constable's Office used excessive force against him during an arrest. (Dkt. 1, pp. 3-4). At the Court's request, Baber supplemented his complaint with a More Definite Statement (Dkt. 8), and a Supplemental More Definite Statement. (Dkt. 13). After screening the complaint under 28 U.S.C. § 1915A(b), the Court dismissed the action as to five of the defendants and ordered service of process on the remaining four defendants: Eric Batton, Sergio Torres, Glenn Salisbury, and Byron Kizzee. (Dkt. 23). Batton,

Torres, and Salisbury answered the complaint,[1] (Dkts. 44, 45, 46), and filed a joint motion for summary judgment. (Dkt. 49). Baber responded to the motion, (Dkt. 51), and the defendants filed a reply. (Dkt. 53). Based on the motion, the response and reply, the summary judgment evidence, all matters of record, and the law, the Court grants the defendants' motion for summary judgment and dismisses Baber's complaint for the reasons explained below.

## I.    BACKGROUND

On April 2, 2019, two officers from the Harris County Precinct 1 Constable's Office conducted a traffic stop of 59-year-old Johnny Baber based on a report from Baber's former girlfriend that he was stalking her. (Dkt. 49-1, p. 2). In his sworn More Definite Statement, Baber alleges that he initially stopped his SUV, but he then panicked because there were bright lights shining in his eyes and he was concerned for his safety. (Dkt. 9, p. 1). He wanted to go to his house, where his son was waiting, to submit to the stop. (*Id.* at 2). Baber then fled the traffic stop and led police—including officers from the Precinct 1 Constable's Office, the Precinct 4 Constable's Office, and the Harris County Sheriff's Office—on a 12-mile, high-speed chase through portions of northwest Harris County. (*Id.*). At one point during the chase, officers tried to stop Baber by deploying spike strips across the road, but

---

[1]Despite multiple attempts at two different addresses, service of process on Byron Kizzee was returned unexecuted. (Dkts. 24, 39).

2

Baber continued driving even after his SUV was partially disabled. (*Id.*).

When Baber neared his house, he pulled into a cul-de-sac and tried to flee on foot; however, a fence blocked the end of the road, and Baber was unable to jump it. (*Id.*). Baber admits in his sworn Supplemental More Definite Statement that he was carrying a firearm at that time, which he tried unsuccessfully to throw over the fence. (Dkt. 13, p. 8). According to Baber, when the firearm fell to the ground, he turned around, put his hands in the air, and surrendered. (*Id.*).

At that point according to Baber, several officers rushed at him and knocked him to the ground with no warning or commands. (Dkt. 9, p. 2). The officers began hitting him in the face and kneeing him in his side. (*Id.*). According to Baber, he was not offering any resistance at that time. (*Id.*) The officers rolled him onto his stomach and placed him in handcuffs. (*Id.*). Then, while Baber was lying face down in handcuffs and no longer offering any resistance, Torres and Salisbury each tased him in the back. (*Id.* at 2-3). Batton also punched him several times in the face and neck after he was handcuffed and no longer resisting. (*Id.* at 3).

Baber was subsequently charged with evading arrest with a vehicle and felon in possession of a firearm. (Dkt. 13, pp. 1, 6). He seeks damages for the pain and suffering he endured because of the taser strikes and punches, as well as for the emotional trauma he allegedly suffers because of the excessive force. (Dkts. 9, p. 4; 13, p. 5).

3

The defendants answered Baber's complaint and then filed a motion for summary judgment. In support of that motion, they filed the incident investigation report and supplemental report from the night of the arrest, along with their individual affidavits. (Dkts. 49-1, 49-2, 49-3, 49-4, 49-5). These reports and sworn testimony indicate that the police were initially called by Baber's former girlfriend, who reported that Baber had two active felony arrest warrants—one for a violation of parole and the other for burglary of a habitation with the attempt to commit a crime—and that he was currently across the street from her house at a storage facility, driving a red SUV. (Dkt 49-1, pp. 4-5). She also reported that Baber was known to carry a firearm. (Dkt. 49-2, p. 8).

The responding deputies confirmed that Baber had outstanding warrants, saw a red SUV leaving the storage facility, and conducted a traffic stop. (Dkts. 49-1, p. 5; 49-2, p. 8). Baber initially stopped and got out of the SUV, but when the officers started to approach him, he began yelling and waving his arms. (*Id.*). Baber then got back into the SUV and fled from the officers at a high rate of speed. (*Id.*).

The officers gave chase. (Dkt 49-1, p. 5). During the chase, officers twice deployed spike strips across Baber's path, but Baber continued to flee. (Dkt. 49-2, p. 2). The chase ended approximately twelve miles later in a residential neighborhood when officers cornered Baber in a cul-de-sac. (Dkts. 49-1, p. 5; 49-2, p. 2).

Once Baber was cornered, Salisbury saw him bail out of the SUV and flee with a firearm in his hand. (Dkts. 49-1, p. 5; 49-2, p. 4; 49-3, p. 2). Batton also saw Baber run from the SUV with "unknown objects clasped in both hands." (Dkt. 49-5, p. 2). Baber fled on foot until he reached an eight-foot-tall privacy fence. (Dkts. 49-1, p. 5; 49-2, p. 4; 49-3, p. 2). When Baber could not jump the fence, he turned back toward the pursuing officers and pointed a small caliber firearm in Batton's direction. (Dkt. 49-5, p. 3). Batton raised his firearm, but before he could fire, Kizzee tackled Baber, knocking him to the ground and knocking the firearm out of his hand in the process. (Dkts. 49-3, p. 3; 49-5, p. 3).

Once on the ground, Baber resisted the officers who were trying to handcuff him by thrashing his body, jerking his arms, and kicking his legs. (Dkts. 49-5, p. 3; 49-4, p. 3). He was also repeatedly yelling, "Kill me." (Dkt. 49-3, p. 3). To attempt to stop Baber from resisting, Salisbury fired his taser once into the center of Baber's back. (Dkt. 49-3, p. 3). Because Baber was still resisting, Torres also fired his taser once into Baber's lower back. (Dkt. 49-4, p. 3). Torres additionally used a "drive stun" technique on Baber's lower back to ensure that the taser hit would be effective. (*Id.*). Because Baber would not move his right arm out from under his body and concerned that he might be trying to hide a second weapon, Batton delivered two or three closed fist strikes to Baber's jaw and neck to try to stop the resistance. (Dkt. 49-5, p. 3). After the tasers were deployed and the punches delivered, Salisbury was

5

able to get Baber's right arm behind him and secure him in handcuffs. (Dkt. 49-3, p. 3). Neither Salisbury nor Torres used their tasers after Baber was handcuffed, and Batton denies striking Baber after he was handcuffed. (Dkts. 49-3, p. 3; 49-4, p. 3; 49-5, p. 3). Once Baber was secured, the firearm was recovered a short distance away. (Dkt. 49-2, p. 9).

In addition to these reports and affidavits, the defendants filed a video recording of portions of the events of April 2, 2019. (Dkt. 49-6). The video shows multiple officers pursuing a red SUV at high speed through the streets of Harris County. (*Id.* at 17:45-24:11). Audio of the officers' radio transmissions indicates that a helicopter was also assisting in the pursuit. (*Id.* at 18:23). Less than thirty seconds after the SUV stops in the cul-de-sac, Baber is tackled to the ground, where he can be seen resisting the officers. (*Id.* at 24:04-24:30). Audio captures the sound of the taser being deployed, while the video shows Baber struggling against an officer who is trying to pull Baber's right arm out from under his body. (*Id.*). Less than one minute later, Baber is secured in handcuffs and all of the officers step away. (*Id.* at 25:18). No additional tasers are fired, and the officers are no longer on the ground with Baber. (*Id.*). A short time later, Baber is escorted toward a patrol car, walking under his own power. (*Id.* at 27:45-27:57).

In his response to the defendants' motion, Baber admits that his initial attempts to flee were "ill-advised." (Dkt. 51, p. 1). He also admits that he made an

"imprudent decision" to flee on foot. (*Id.* at 1-2). However, he denies that he had a firearm in his hand when he fled from the SUV. (*Id.* at 2). He also alleges that once he could not jump the fence, he turned around and peacefully submitted to the arrest with further resistance. (*Id.* at 2-3). He asserts that he posed no threat to the officers when they tackled him to the ground and tased him and that the defendants' use of tasers and closed-fist punches at that time was excessive force. (*Id.* at 4). He also alleges that factual disputes about the existence of the firearm and when the force was used should preclude entry of summary judgment in favor of the defendants. (*Id.* at 4-5).

In their reply, the defendants point out that Baber previously admitted in his sworn Supplemental More Definite Statement that he was carrying a firearm when he fled on foot from the SUV. (Dkt. 53, p. 6). They also assert that the video belies Baber's contention that he peacefully surrendered to the officers. (*Id.*). They argue that when considered in light of all the evidence, their actions were reasonable and they should be entitled to summary judgment. (*Id.* at 8-10).

## II.   LEGAL STANDARDS

### A.   Actions Under 42 U.S.C. § 1983

Baber filed his complaint against the defendants under 42 U.S.C. § 1983. "Section 1983 does not create any substantive rights, but instead was designed to provide a remedy for violations of statutory and constitutional rights." *Lafleur v.*

7

*Texas Dep't of Health*, 126 F.3d 758, 759 (5th Cir. 1997) (per curiam); *see also Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).  To state a valid claim under § 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *See West v. Atkins,* 487 U.S. 42, 48 (1988); *Gomez v Galman*, 18 F.4th 769, 775 (5th Cir. 2021) (per curiam). The dispute in this case focuses on the first element: whether the defendants violated Baber's constitutional rights.

### B.    <u>Summary-Judgment Standard</u>

The defendants have filed a motion for summary judgment.  "Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton,* 572 U.S. 650, 656-57 (2014) (per curiam) (quoting FED. R. CIV. P. 56(a)).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.,* 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-25 (1986)).  "A fact is material if its resolution could affect the outcome of the action." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 134 (5th Cir. 2010)).  "A dispute is genuine if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (cleaned up).

When considering a motion for summary judgment, the Court must view all evidence and draw all inferences "in the light most favorable to the [nonmoving] party." *Tolan*, 572 U.S. at 657 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)); *see also Dyer*, 964 F.3d at 380. However, if record evidence clearly contradicts the plaintiff's version of events, the Court "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Waddleton v. Rodriguez*, 750 F. App'x 248, 253-54 (5th Cir. 2018) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). This is particularly true when there is video evidence. When video evidence exists, the Court will "view[] the facts in the light depicted by the videotape." *Salazar v. Molina*, 37 F.4th 278, 280 (5th Cir. 2022) (quoting *Scott*, 550 U.S. at 381), *cert. denied*, No. 22-564, 2023 WL 3046124 (Apr. 24, 2023); *see also Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022) ("[W]e assign greater weight, even at the summary judgment stage, to the video recording taken at the scene."); *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) ("A court of appeals need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider the facts in the light depicted by the videotape."). The Court "will not adopt facts that are clearly contradicted by the video." *Waddleton*, 750 F. App'x at 254 (citing *Scott*, 550 U.S.

9

at 378).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to point to evidence that shows that genuine disputes of material fact exist. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). This burden cannot be satisfied with conclusory allegations or unsubstantiated assertions. *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, the nonmoving party must identify specific facts in the record that show that there is a genuine issue for trial. *Id.* (citing *Celotex,* 477 U.S. at 325). "If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted." *Id.* at 1076.

### C.   *Pro Se* Pleadings

Because Baber is representing himself, the Court construes his pleadings liberally, subjecting them to "less stringent standards than formal pleadings drafted by lawyers[.]" *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam). But even under this lenient standard, self-represented litigants must still "abide by the rules that govern the federal courts." *E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475, 484 (5th Cir. 2014) (quoting *Frazier v. Wells Fargo Bank, N.A.*, 541 F. App'x 419, 421 (5th Cir. 2013)). "*Pro se* litigants must properly plead sufficient facts that, when liberally construed, state a plausible claim to relief, serve defendants, obey discovery orders, present summary judgment evidence, file a notice of appeal, and brief arguments on

10

appeal." *Id.* (footnotes omitted).

## III.   DISCUSSION

### A.   Excessive Force

Arrestees like Baber have the right under the Fourth Amendment to be free from the use of excessive force. *See Brousseau v. Haugen*, 543 U.S. 194, 197 (2004). However, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Therefore, to prevail on an excessive force claim under the Fourth Amendment, the arrestee must prove that he suffered an "(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Malbrough v. Stelly*, 814 F. App'x 798, 802-03 (5th Cir. 2020) (quoting *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008)); *see also Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

The critical question in a Fourth Amendment excessive force case is whether the force used to effect the particular seizure or arrest was "reasonable." *Graham,* 490 U.S. at 396. Whether the force used was reasonable "depends on the facts and circumstances of the particular case." *Cooper v. Brown,* 844 F.3d 517, 524-25 (5th Cir. 2016). The relevant facts and circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers

11

or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  Moreover, because police officers must make split-second decisions in "tense, uncertain, and rapidly evolving" situations, the Court considers the reasonableness of the force used from the perspective of a reasonable officer on the scene "rather than with the 20/20 vision of hindsight." *Id.* at 396-97. Considering these factors in light of the summary judgment evidence in this case compels the Court to conclude that the force used by the defendants against Baber was not unreasonable.

### 1.   Severity of the Crime

The first *Graham* factor is "the severity of the crime at issue." *Id.* at 396. Baber was initially stopped based on allegations of stalking and the existence of two outstanding felony warrants.  He fled from the initial traffic stop and led officers on a twelve-mile, high-speed chase through a large portion of northwest Harris County, posing a threat not only to the officers in pursuit but also to pedestrians and other motorists in the area.  When Baber was cornered in a cul-de-sac in a residential neighborhood, he fled on foot while carrying a firearm, posing further risks to both the officers and innocent bystanders.  He was subsequently charged with evading arrest with a vehicle and felon in possession of a firearm.

In general, "leading law enforcement in a high-speed chase through a heavily populated area is a serious crime that puts at risk not only the lives of Plaintiff and

the officers but also those of the general public." *Salazar*, 37 F.4th at 281-82. Indeed, the Fifth Circuit has found "far less dangerous offenses to be 'serious' for purposes of the first *Graham* factor." *Id.* at 282 (citing *Cooper*, 844 F.3d at 522 (finding DUI to be a serious offense); *Brothers v. Zoss*, 837 F.3d 513, 519 (5th Cir. 2016) (DUI and interfering with the duties of a public servant are serious offenses)). Because of Baber's high-speed flight, as well as his possession of a firearm while doing so, this factor weighs against finding that the defendants' use of force was unreasonable.

### 2.   **Threat to Safety**

The second *Graham* factor is "whether the suspect poses an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. Baber argues that he was attempting to peaceably surrender and posed no threat to anyone's safety when the defendants tased and punched him. He asserts that in determining whether he posed a threat, the Court should not consider any of the events that occurred before he ceased his flight at the fence. (Dkt. 51, p. 4).

However, the Fifth Circuit has explicitly rejected this argument, explaining:

> Salazar's position [that the court should not consider his actions before his surrender] comports with neither common sense nor our precedent. First, as a matter of common sense, what preceded the surrender matters. A reasonable officer will have little cause to doubt the apparent surrender of a compliant suspect who has not engaged in dangerous or evasive behavior. But when a suspect has put officers and bystanders in harm's way to try to evade capture, it is reasonable for

13

> officers to question whether the now-cornered suspect's purported surrender is a ploy. That's especially true when a suspect is unrestrained, in close proximity to the officers, and potentially in possession of a weapon.

*Salazar*, 37 F.4th at 282; *see also Scott*, 550 U.S. at 383 (considering all of the circumstances involved in Harris's ten-mile, high-speed flight from the pursuing officers in determining whether the force used to actually seize him was unreasonable); *Escobar v. Montee*, 895 F.3d 387, 394-95 (5th Cir. 2018) (allowing the court to consider all of the circumstances that indicated that the suspect might still be a threat despite his apparent surrender).

Baber also argues that whether he had a firearm when he fled on foot is a disputed issue of fact that precludes summary judgment. (Dkt. 51, p. 2). But Baber admitted in his sworn Supplemental More Definite Statement that he had the firearm in his hand when he fled the SUV and that he tried unsuccessfully to throw it over the fence before turning to face the pursuing officers. (Dkt. 13, p. 8). A party cannot create a genuine issue of material fact sufficient to avoid summary judgment by contradicting his own prior sworn statements. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *In re Deepwater Horizon,* 857 F.3d 246, 250 (5th Cir. 2017). The Court will credit Baber's initial sworn testimony on this point over his unsworn and contradictory allegations made in response to the defendants' motion.

The summary judgment evidence and undisputed facts show that the officers initially stopped Baber based on two outstanding felony warrants and a current allegation of stalking. Baber fled from that initial stop and led officers on an extended high-speed chase, refusing to stop even after spike strips partially disabled the SUV. When he found himself trapped in a cul-de-sac, Baber fled on foot with a firearm in hand and ceased his flight only when he could not scale a fence. At that point, the defendants could rightly question whether Baber's purported surrender was a ploy and could reasonably believe that some force was necessary to subdue and arrest him. This *Graham* factor weighs against a finding that the defendants used excessive force in arresting Baber.

### 3. Active Resistance or Flight

The third *Graham* factor is "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The Fifth Circuit has concluded that this factor "largely folds into the second. If [the suspect] may have posed a threat, then he also might have attempted to flee." *Escobar*, 895 F.3d at 396.

The evidence before the Court shows that Baber led multiple officers on an extended high-speed chase on heavily traveled roads in Harris County before trying to escape on foot while carrying a firearm. Only an eight-foot privacy fence stopped Baber's flight. These facts made it reasonable for the defendants to fear that Baber

15

still sought to escape and weigh against any finding that the force used was excessive.

In his reply, Baber contends that even if the use of some force was reasonable when making the arrest, the force became excessive when the defendants beat and tased him after he was handcuffed. (Dkt. 51, p. 4). But the video evidence contradicts Baber's assertion that force was used at that point. Instead, the video shows that Baber was tased and punched only while he was still resisting and before the officers were able to secure him in handcuffs. (Dkt. 49-6 at 24:30-25:18). Once Baber was secured in handcuffs, the taser was not fired again and the officers all stepped away from him. (*Id.* at 25:18). The Court will not accept Baber's unsupported allegations that are contradicted by the video evidence. *See Carnaby*, 636 F.3d at 187 (holding that the Court "need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider the facts in the light depicted by the videotape"). The third *Graham* factor supports the reasonableness of the defendants' use of force to subdue and handcuff Baber.

In sum, when the defendants decided to deploy their tasers and fists against Baber, he had just fled from a traffic stop, led the police on a twelve-mile, high-speed chase, attempted to flee on foot while brandishing a firearm, and finally attempted to jump an eight-foot privacy fence. These events could reasonably cause the defendants to be concerned about the sincerity of Baber's purported surrender.

The totality of the force deployed—two tasings and two closed-fist punches—was not objectively unreasonable when considered in light of all of these facts. The defendants' actions were not an unreasonable use of force under the circumstances and did not turn Baber's lawful arrest into an unreasonable seizure under the Fourth Amendment. The defendants are entitled to summary judgment in their favor on Baber's excessive force claim.

### B.   Qualified Immunity

Alternatively, even if there was some evidentiary basis upon which to conclude that the defendants' use of force was unreasonable, they would be entitled to summary judgment under the doctrine of qualified immunity. "[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)). A right is clearly established when its existence is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (cleaned up). In the context of a high-speed chase, "the law must be *so* clearly established that—in the blink of an eye, in the middle of a high-speed chase—every reasonable officer would know . . . immediately" that his actions were violating the law. *Morrow v. Meachum*, 917 F.3d

17

870, 876 (5th Cir. 2019).

When a government official moves for summary judgment on the basis of qualified immunity, "the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact [dispute] as to whether the official's allegedly wrongful conduct violated clearly established law." *Dyer*, 964 F.3d at 380 (alteration in original) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)); *see also Ramirez v. Escajeda*, 44 F.4th 287, 291 (5th Cir. 2022). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little*, 37 F.3d at 1075). Instead, the nonmoving party must identify specific evidence in the record and explain how that evidence supports that party's claim. *See Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).

Baber does not meet this burden. He admits that he had active felony warrants for his arrest when the initial traffic stop occurred. He admits that he fled from he officers after the initial stop. He admits that he led officers on a twelve-mile, high-speed chase and that he tried to flee on foot after stopping his SUV. He admits that he had a firearm in his hand as he fled. While he alleges that he had stopped resisting before Salisbury and Torres deployed their tasers and before Batton punched him, the video evidence shows that Baber was still resisting when the tasers were

18

deployed and that the taser shots ended as soon as he was securely handcuffed. (Dkt. 49-6 at 24:30-25:18). While Baber might be correct that the use of tasers after he was handcuffed would be excessive force, the evidence does not show that those are the facts here. And even if this Court were to find that either the second taser shot or the punches were unnecessary—a finding this Court does not make—"[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" constitutes excessive force. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citation omitted). Baber's prior flight, his possession of a firearm, and his active resistance to the arresting officers supported the use of some force to gain his compliance. While the alleged punch and second taser shot may have crossed the line of excessiveness, given the threat posed by Baber's actions and the need to secure him, they did not clearly do so.

Baber fails to point to evidence sufficient to show a factual dispute material to the issue of whether the defendants violated clearly established law in using the force they did, and his unsupported assertions that the taser shots and punches were unnecessary are insufficient. Even if the force used was constitutionally excessive, the defendants would be entitled to summary judgment in their favor on the basis of qualified immunity.

## C.   **Defendant Kizzee**

The Court initially ordered service on Deputy Kizzee through the Harris

19

County Precinct 4 Constables Office. (Dkt. 23). Service on Kizzee was returned unexecuted with a notice that he is no longer employed by that office. (Dkt. 24). The Court ordered the Constables Office to provide its last-known address for Kizzee. (Dkt. 29). After receiving that information, (Dkt. 34), the U.S. Marshals attempted to serve Kizzee at his last-known address, but service was again returned unexecuted. (Dkt. 39). As of the date of this Order, the Court has been unable to serve Kizzee with the summons and complaint. Until Kizzee is properly served, he is not a proper party to this case, and the Court may not enter a default or a default judgment against him. *See, e.g., Thompson v. Johnson,* 348 F. App'x 919, 923 (5th Cir. 2009) (per curiam); *Rogers v. Hartford Life & Accident Ins. Co.*, 167 F.3d 933, 937 (5th Cir. 1999) (holding that until a defendant is served with the summons and complaint, "the defendant has no duty to answer the complaint and the plaintiff cannot obtain a default judgment"); *Broadcast Music, Inc. v. M.T.S. Enters., Inc.,* 811 F.2d 278, 282 (5th Cir.1987) ("No person need defend an action nor suffer judgment against him unless he has been served with process and properly brought before the court.").

However, the issues raised in the defendants' motion for summary judgment apply equally to Kizzee. The Fifth Circuit has held that when one defending party establishes that the plaintiff has no cause of action, the defense can be applied to the benefit of other, similarly situated defendants. *See Lewis v. Lynn*, 236 F.3d 766, 768

20

(5th Cir. 2001) (quoting *United States v. Peerless Ins. Co.*, 374 F.2d 942, 945 (4th

Cir. 1967)).  Because the evidence shows that all of the defendants were present at

the same scene of Baber's arrest and because the summary judgment evidence shows

that the remaining defendants are entitled to qualified immunity, Kizzee—as a

similarly situated defendant—would likewise be entitled to qualified immunity.

Baber's claim against Kizzee, based on the same allegations of excessive force that

apply to the other defendants, fails for the same reason.  His claims against Kizzee

will be dismissed as barred by qualified immunity.

## IV.    CONCLUSION

Based on the foregoing, the Court **ORDERS** as follows:

1.  The defendant's motion for summary judgment, (Dkt. 49), is **GRANTED**.

2.  This action is **DISMISSED** with prejudice.

3.  Any pending motions are **DENIED as moot**.

The Clerk shall provide a copy of this order to the parties.

SIGNED at Houston, Texas on ____*apr. 27*____, 2023.

DAVID HITTNER
UNITED STATES DISTRICT JUDGE

21